**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ESTECH SYSTEMS, INC., | |
| *Plaintiff,* | |
| v. | Case No. 2:20-cv-00275-JRG-RSP (LEAD CASE) |
| BURNCO TEXAS LLC and BURNCO ROCK PRODUCTS LTD., | |
| *Defendants.* | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of Estech Systems, Inc. ("Plaintiff") (Dkt. No. 69),[1] the response of BURNCO Texas LLC, BURNCO Rock Products Ltd., Burrow Global LLC, Hancock Whitney Bank, and Hancock Whitney Corporation, (collectively "Defendants") (Dkt. No. 70), and Plaintiff's reply (Dkt. No. 71). On June 4, 2021, the Court held a hearing on the issues of claim construction and claim definiteness. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.    BACKGROUND ................................................................................................. 3

    A.    U.S. Patent No. 6,067,349 ....................................................................... 3

    B.    U.S. Patents No. 7,068,684, No. 7,123,699, and No. 8,391,298 ............ 4

    C.    Previous District Court Proceedings ....................................................... 6

II.    LEGAL PRINCIPLES ..................................................................................... 10

    A.    Claim Construction ............................................................................... 10

    B.    Departing from the Ordinary Meaning of a Claim Term ...................... 13

    C.    Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ........ 14

III.    AGREED CONSTRUCTIONS ....................................................................... 16

IV.    CONSTRUCTION OF DISPUTED TERMS ................................................. 16

    A.    U.S. Patent No. 6,067,349 ..................................................................... 16

        A-1.    "storing the caller ID information in association with the voice mailbox" .......................................................................................... 16

        A-2.    "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message" ................................................................................. 19

    B.    U.S. Patent No. 7,068,684 ..................................................................... 21

        B-1.    "a data server coupled to the hub" ........................................... 21

        B-2.    "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step" ................................. 22

    C.    U.S. Patent No. 7,123,699 ..................................................................... 24

        C-1.    "coupling an audio path over the channel between the telecommunications device and the voice mail box" ............................... 24

        C-2.    "in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel" ....................................... 266

    D.    U.S. Patent No. 8,391,298 ..................................................................... 28

        D-1.    "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN" ....................................... 28

        D-2.    "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN" ......................................... 30

        D-3.    "circuitry for automatically calling …" .................................... 32

V.    CONCLUSION ............................................................................................... 36

## I. BACKGROUND

Plaintiff alleges infringement of four U.S. Patents: No. 6,067,349 ("'349 Patent"), No. 7,068,684 ("'684 Patent"), No. 7,123,699 ("'699 Patent"), and No. 8,391,298 ("'298 Patent") (collectively, the "Asserted Patents").

### A. U.S. Patent No. 6,067,349

In general, the '349 Patent is directed to technology for using caller ID for dialing out and creating calling (speed-dial) lists.

The '349 Patent issued from an application filed on December 31, 1997.

The abstract of the '349 Patent provides:

> A telephone and voice mail (voice processing) system, which is implemented using only a single processing system for controlling operation of both the telephone system and the voice mail system, permits a user to call back a party using caller ID data stored with a voice mail message left by the party calling into the system. This is accomplished by storing caller ID information associated with an incoming call along with the message placed by the incoming caller and stored within the mailbox associated with the called party. Additionally, the caller ID information may be used to create a speed dial list within the telephone and voice mail system for later use by the user. Such caller ID information may be retrieved from a voice mail message left by the calling party, or may be retrieved while conducting a con-versation with the incoming call.

Claim 1 of the '349 Patent, an exemplary asserted claims, provide as follows (with terms in dispute emphasized):

> **'349 Patent Claim 1.** A method comprising the steps of:
> receiving an incoming call from a calling party over a switched telephone network, wherein the incoming call includes caller ID information, wherein the caller ID information includes a telephone number of the calling party;
> connecting the incoming call to a voice mailbox;
> ***storing the caller ID information in association with the voice mailbox***, wherein the voice mailbox is associated with a called party, and wherein the caller ID information is stored in association with a voice message left by the calling party for the called party in the voice mailbox; and
> ***automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message***.

### B.     U.S. Patents No. 7,068,684, No. 7,123,699, and No. 8,391,298

The '684, '699, and '298 Patents are each generally directed to technology for improving Voice over IP systems. More specifically: The '684 Patent is generally directed to technology for improved bandwidth sharing between data and IP telephony systems on a network. The '699 Patent is generally directed to technology for improving voice mail in an IP telephony system. The '298 Patent is generally directed to technology for improving phone-number directories in an IP telephony system.

These patents are related through priority claims. Each patent lists a priority claim to the application that issued as the '684 Patent, which was filed on February 1, 2001. The '699 Patent issued from an application that is a continuation-in-part of the '684 Patent's application. Similarly, the '298 Patent issued from an application that is a continuation-in-part of the '684 Patent's application.

The abstract of the '684 Patent provides:

> An information handling system comprises a TCP/IP network connecting a hub to a multimedia server and the hub to a data server, and the hub to an IP telephony device that is then coupled to a network device. Data sent from the network device is addressed for transmission to the data server and is transmitted through the IP telephony device to the TCP/IP network. The IP telephony device monitors when an amount of data being received over the network falls below a predetermined threshold. If this occurs, the IP telephony device will send a signal to the multimedia server, which will then generate a congestion signal to send to all or selected IP telephony devices in the network to throttle data being received by the IP telephony devices from their respective connected network devices.

The abstract of the '699 Patent provides:

> In a voice over IP system, an IP telephone includes an LED lamp that indicates a voice message has been stored in a remote voice mail system. The IP telephone can then access that voice message. The message can also be moved from one remote site to another.

The abstract of the '298 Patent provides:

In a Voice over IP system, a user can dial numbers stored in a series of lists, which are stored in the system and displayed to the user of an IP telephone. One implementation will allow a user to scroll through a list of remote sites. When the user finds the desired site, the user is then presented with the same options as a user local to that site. All of this can be performed without the need for an operator or a printed directory. This system provides an ability for a user to scroll through a list of names and phone numbers and then call a person once their name and phone number is displayed.

Claim 29 of the '684 Patent, Claim 1 of the '699 Patent, and Claim 1 of the '298 Patent,

exemplary asserted claims, recite (with terms in dispute emphasized):

> **'684 Patent Claim 29**. In an information handling system comprising a hub, a multimedia server ("multimedia server") coupled to the hub, a telephone coupled to the hub, a workstation coupled to the hub through the telephone, and ***a data server coupled to the hub***, a method comprising the steps of:
>> transferring data from the workstation to the telephone, wherein the data sent from the
>> workstation is addressed for transmission to the data server;
>> communicating audio information between the telephone and the multimedia server; and
>> ***sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step***, wherein the throttling step further comprises the step of monitoring an amount of the audio information being received by the telephone from the multimedia server.

> **'699 Patent Claim 1**. In a telecommunications system, a method comprising the steps of:
>> storing a voice mail message in a voice mail box in a voice mail system within a first LAN;
>> coupling a second LAN to the first LAN over a WAN, wherein the first LAN, the second LAN, and the WAN operate under a mutable network protocol;
>> providing a sensory indication on a telecommunications device within the second LAN that the voice message is stored in the voice mail box within the first LAN; and
>> the telecommunications device accessing the voice mail system within the first LAN to listen to the voice message stored in the voice mail box,
>> wherein the step of the telecommunications device accessing the voice mail system within the first LAN to listen to the voice message stored in the voice mail box further comprises the steps of:
>> establishing a channel between the first and second LANs over the WAN;
>> ***coupling an audio path over the channel between the telecommunications device and the voice mail box***; and

streaming voice data containing the voice message from the voice mail box to the telecommunications device over the audio path, wherein the establishing step further comprises the steps of:

*in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel*, wherein the user mail box connection message includes an extension associated with the telecommunications device and an identification of the voice mail box;

assigning the channel by the first LAN; and

sending a connection established message from the first LAN to the second LAN.

**'298 Patent Claim 1.** An information handling system comprising:

a first local area network ("LAN");

a second LAN;

a wide area network ("WAN") coupling the first LAN to the second LAN;

a third LAN coupled to the first and second LANs via the WAN;

a first telecommunications device coupled to the first LAN;

a plurality of telecommunications extensions coupled to the second LAN;

the first LAN including first circuitry for enabling a user of the first telecommunications device to observe a list of the plurality of telecommunications extensions;

the first LAN including *second circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list*, *wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN*; and

a plurality of telecommunications extensions coupled to the third LAN, the first LAN including circuitry for enabling the user to *select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN*.

## C.    Previous District Court Proceedings

The Court recently construed the Asserted Patents in *Estech Systems, Inc. v. Target Corporation et al.*, 2:20-cv-00123-JRG-RSP, Dkt. No. 159 (E.D. Tex. Mar. 21, 2021) (the "*Target Markman*"). The Court there addressed related claim-construction disputes as follows:

| term | Plaintiff's Proposal | *Target Markman* Defendants' Proposal | *Target Markman* Construction |
|---|---|---|---|
| "wherein the caller ID information is stored in association with a voice message"<br><br>• '349 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | the voice message file and the caller ID information are stored on the same hard disk | plain and ordinary meaning |
| "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message"<br><br>• '349 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | while a voice message is audibly played to the called party, initiating a connection request for a call from the called party to the calling party without the called party dialing any digit of the telephone number of the calling party | plain and ordinary meaning |
| "a data server coupled to the hub"<br><br>• '684 Patent Claims 29, 36, 37 | Plain and ordinary meaning; no construction necessary. | a data server wired to the hub<br><br>alternatively,<br>• a data server connected to the hub where the connection is a wired connection. | a data server communicatively connected to the hub |
| "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step"<br><br>• '684 Patent Claims 29, 36, 37 | Plain and ordinary meaning; no construction necessary. | reducing the number of data packets sent from the workstation to the telephone to comply with a predetermined quality of service level of audio allowing for no discernable audio decrease in quality | plain and ordinary meaning |

| term | Plaintiff's Proposal | *Target Markman* Defendants' Proposal | *Target Markman* Construction |
|---|---|---|---|
| "coupling an audio path over the channel between the telecommunications device and the voice mail box"<br><br>• '699 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | creating a dedicated electrical connection for the flow of audio information between the telecommunications device and the voice mail box | communicatively connecting a path capable of transferring audio information such as voice data over the channel between the telecommunications device and the voice mail box |
| "in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel"<br><br>• '699 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | requesting a dedicated electrical connection between the first LAN and second LAN for the transfer of real-time audio data in response to an input at the telecommunications device | plain and ordinary meaning |
| "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | the alpha-numeric depiction of all telephone extensions for all telephones located on the second LAN is stored in memory located on the second LAN | plain and ordinary meaning |

| term | Plaintiff's Proposal | *Target Markman* Defendants' Proposal | *Target Markman* Construction |
|---|---|---|---|
| "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | determine which of two [lists of the plurality of telecommunications extensions] is displayed to the user | select which of two [lists of the plurality of telecommunications extensions] is to be audibly or visibly displayed to the user |
| "second circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | This is a 112 ¶ 6 claim element.<br><br>function:<br>• automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list<br><br>structure:<br>• DSP structure disclosed at 4:26-56, 5:33-38, 6:9-23, 8:66- 9:24 and equivalents thereof, including then existing Texas Instrument 5410 DSPs | not §112, ¶ 6; plain and ordinary meaning |

| term | Plaintiff's Proposal | *Target Markman* Defendants' Proposal | *Target Markman* Construction |
|---|---|---|---|
| "second circuitry for automatically calling the second telephone extension in response to the user selecting the second telephone extension from the viewed list"<br><br>• '298 Patent Claim 9 | Plain and ordinary meaning; no construction necessary. | This is a 112 ¶ 6 claim element.<br><br>function:<br>• automatically calling the second telephone extension in response to the user selecting the second telephone extension from the viewed list<br><br>structure:<br>• DSP structure disclosed at 4:26-56, 5:33-38, 6:9-23, 8:66- 9:24 and equivalents thereof, including then existing Texas Instrument 5410 DSPs | not §112, ¶ 6; plain and ordinary meaning |

## II.     LEGAL PRINCIPLES

### A.     Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim

term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples

appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a

term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*. The Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

C.      **Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA)**

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). § 112, ¶ 6, provides that a structure may be claimed as a "means … for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites

sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Communications, L.L.C. v. International Trade Commission*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function … even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step … is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written

description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

## III. AGREED CONSTRUCTIONS

The parties have agreed to constructions set forth in their Joint Claim Construction Chart Pursuant to Rule 4-5(d) (Dkt. No. 72). Based on the parties' agreement, the Court hereby adopts the agreed constructions.

## IV. CONSTRUCTION OF DISPUTED TERMS

### A. U.S. Patent No. 6,067,349

#### A-1. "storing the caller ID information in association with the voice mailbox"

| Disputed Term[3] | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "storing the caller ID information in association with the voice mailbox"<br><br>• '349 Patent Claim 1 | plain and ordinary meaning | the voice message file and the caller ID information are stored in the same system |

---

[3] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Joint Claim Construction Chart Pursuant to Rule 4-5(d) (Dkt. No. 72) are listed.

## The Parties' Positions

Plaintiff submits: The issue with respect to this term is similar to the issue addressed by the Court in the Target Case when construing "wherein the caller ID information is stored in association with a voice message." A plain reading of the claim language establishes that the caller ID information is necessarily stored in association with the voice mailbox but this does not require that the two be stored in the same file.[4] Dkt. No. 69 at 28–29.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '349 Patent col. 10 ll. 25–31.

Defendants respond: The '349 Patent describes that the caller ID information and the voice message are stored together on the same hard disk, "and makes a passing reference to 'some other memory means' that remains undescribed in the specification." More specifically, the patent states that caller ID information "is retrieved and stored by **a** telephone call/voice processing system" (quoting '349 Patent col. 1 ll. 37–38 (Defendants' emphasis)). Indeed, the patent specifies that the invention is a "single processing system for controlling operation of both the telephone system and the voice mail system" and that it is "implemented using only a single processing system" (quoting *id.* at [57] Abstract). The patent does not describe communication between distinct systems to store caller ID in association with the voice message. This means that a single system stores both the caller ID in association with the voice message file. Dkt. No. 70 at 11–13.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '349 Patent, at [57] Abstract, col. 1 ll. 11–14, col. 1 ll. 37–38, col. 2 ll. 53–55, col. 2 ll. 59–64, col. 3 ll. 44–47, col. 8 ll. 6–10, col. 8 ll. 16–17, col. 8 ll. 32–35, col. 8 ll. 46–47, col. 9 ll. 6–15, col. 9 ll. 22–24, col. 9 ll. 36–40.

---

[4] Defendants originally proposed that the term be construed as "the caller ID information is stored within the voice message file in the voice mailbox." Dkt. No. 58-2 at 4.

Plaintiff replies: Nothing in the description of the embodiments warrants limiting storage of the caller ID information and the voice mailbox to the same system. Dkt. No. 71 at 11–12.

<u>**Analysis**</u>

The issue in dispute appears to be whether storing caller ID "in association with" the voice mailbox is coextensive with storing the caller ID and voice mailbox in the same system. It is not.

The Court declines to inject a "same system" limitation into the claim. Specifically, this limitation injects ambiguity into otherwise plain claim language. For instance, the '349 Patent provides "[a] telephone and voice mail (voice processing) system, which is implemented using only a single processing system for ***controlling operation of both*** the telephone system and the voice mail system." '349 Patent, at [57] Abstract (emphasis added). The patent also provides that "[t]he present invention relates in general to telephone and voice processing systems, and in particular, to a telephone call/voice processing system that uses caller ID information for dialing out and creating calling lists." *Id*. at col.1 ll.11–14; *see also, id*. at col.1 ll.37–38 ("In the present invention, caller ID information is retrieved and stored by a telephone call/voice processing system."). The patent further describes an exemplary system that includes other systems: "system 100 for telephone call and voice processing" includes a "digital signal processor ('DSP') 102" which includes an "automatic gain control ('AGC') 502 … system." *Id*. at figs.1, 5, col.2 l.49 – col.3 l.10. The patent also describes that a "system" may include a "peripheral card" coupled to the system. *See, e.g., id*. at col.2 ll.7–9 ("FIG. 1 illustrates, in block diagram form, components of a telephone call/voice processing system; … FIG. 3 illustrates, in block diagram form, components of a port card implemented within the telephone call/voice processing system of FIG. 1"), col.5 ll.7–10 ("Referring next to FIG. 3, there is illustrated peripheral-card ('p-card') 300, which is coupled to main board 190 of system 100**.**"). In context, "system" denotes a generic collection of

components and functions and can evolve to encompass both a specific collection of components and components coupled to that collection. The term "system" alone is not used to delineate one collection from another. Injecting a "same system" limitation into Claim 1, which is a method claim that does not recite "system," threatens to obfuscate or improperly limit claim scope rather than clarify claim scope.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plan and ordinary meaning without the need for further construction.

<strong>A-2. "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message"</strong>

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "automatically dialing the telephone number at a request of the called party while the called party is listening to the voice message"<br><br>• '349 Patent Claim 1 | plain and ordinary meaning | while a voice message is audibly played to the called party, initiating a connection request for a call from the called party to the calling party without the called party dialing any digit of the telephone number of the calling party |

**The Parties' Positions**

Plaintiff submits: "Defendants' proposed construction adds ambiguity to the term by requiring entry of a phone number without actually dialing the phone number." Dkt. No. 69 at 29–30.

Defendants respond: As described in the '349 Patent, a user listening to a voicemail message may request automatic dialing of the phone number that left the message by pressing a "redial key" to initiate the dialing task. The "redial key" "is not a digit of the phone number." Plaintiff "has not identified any other embodiments beyond the repeated description of this action." And this term should be construed to "ensure the claims of the '349 Patent are afforded their scope as evidenced

by what the applicant had in its possession as of the filing of the '349 Patent." Dkt. No. 70 at 14–15.

In addition to the claims themselves, Defendants cite the following intrinsic evidence to support their position: '349 Patent col.8 ll.43–49, col.9 ll.8–11, col.9 ll.29–35; Dkt. No. 70-5 at 110–15, 114, Dkt. No. 70-5 at 118–26, 119, Dkt. No. 70-5 at 127–29.

Plaintiff replies: This term consists of common words with plain meanings and there is no basis for straying from the plain meaning of the term. Dkt. No. 71 at 12–14.

**<u>Analysis</u>**

The issue in dispute appears to distill to whether the "request" in the phrase "automatically dialing the telephone number at a request of the called party" necessarily excludes selecting a digit of the telephone number. It does not.

The Court addressed this issue, including substantially identical arguments and evidence, in the Target Case. *Target Markman* at 17–19. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plan and ordinary meaning without the need for further construction.

## B.      U.S. Patent No. 7,068,684

### B-1.    "a data server coupled to the hub"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "a data server coupled to the hub"<br><br>• '684 Patent Claims 29, 36, 37 | a data server communicatively coupled to the hub | a data server wired to the hub<br><br>alternatively,<br>• a data server connected to the hub where the connection is a wired connection |

**The Parties' Positions**

Plaintiff submits: The term "coupled" is used according to its customary meaning, which is not limited to a wired connection. And the description of embodiments of the invention do not support narrowing the meaning of "coupled" to a wired connection. Notably, while the '684 Patent describes using Ethernet as a data transfer protocol, Ethernet is expressly an exemplary protocol and is not limited to a wired connection in any event. Dkt. No. 69 at 10–13.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '349 Patent col.3 l.67 – col.4 l.1.

Defendants respond: "The '684 Patent consistently, and exclusively, uses the word 'coupled' to describe a wired connection." Further, in the relevant time period, "coupling" meant a wired connection because "wireless connections were not contemplated for the connections in the described systems." Thus, the Court should "limit the scope of the claims of the '684 Patent to what was actually in the Applicants' possession in 2001." Dkt. No. 70 at 15–17.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '684 Patent col.4 ll.6–12, col.5 ll.23–25, col.5 ll.36–42, col.10 ll.40–43. col.11 ll.2–4, col.11 ll.65–67.

Plaintiff replies: Defendants' argument is the same as that addressed by the Court in the Target Case. As recognized in the *Target Markman*, "coupled" is not limited to a wired connection. Dkt. No. 71 at 6.

**Analysis**

The issue in dispute is whether the coupling of the data server to the hub necessarily excludes all coupling other than a wired connection. It does not.

The Court addressed this issue, including substantially identical arguments and evidence, in the Target Case. *Target Markman* at 20–22. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Accordingly, the Court construes this term as follows:

- "a data server coupled to the hub" means "a data server communicatively connected to the hub."

**B-2.** **"sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "sufficiently throttling the data sent from the workstation to the telephone to increase a rate of transfer of the audio information during the communicating step"<br><br>• '684 Patent Claims 29, 36, 37 | plain and ordinary meaning | reducing the number of data packets sent from the workstation to the telephone to comply with a predetermined quality of service level of audio allowing for no discernable audio decrease in quality |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction. It is not limited to "reducing the number of data packets," or "comply[ing] with a predetermined quality of service level of audio," or "allowing for no discernable audio decrease in quality." The description of embodiments of the invention does not support limiting this term as Defendants suggest. In fact, the '684 Patent describes throttling of "data" rather than "data packets" and allowing a decrease in audio quality rather than precluding it. Dkt. No. 69 at 13–15.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '684 Patent col.12 ll.36–45.

Defendants respond: The only guide to the sufficiency of throttling provided in the '684 Patent is "the use of Quality of Service ('QoS')-based throttling." And "[g]iven the patent's use of the term *amount*, it is clear that what is contemplated by throttling, in part, is the *number* of data packets (e.g., a level)" (Defendants' emphasis). In fact, the patent describes that the throttling is triggered by a threshold number of data packets. Dkt. No. 70 at 17–19.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '684 Patent, at [57] Abstract, col.1 ll.56–58, col.4 ll.43–46, col.12 l.13, col.12 ll.36–45, col.13 ll.17–49, col.13 l.54 – col.14 l.12, col.14 ll.41–46; Dkt. No. 70-6 at 304–24, 322.

Plaintiff replies: Defendants' argument is the same as that addressed by the Court in the Target Case. Dkt. No. 71 at 6.

**Analysis**

There appear to be two issues in dispute. First, whether "throttling the data" necessarily entails "reducing the number of data packets." It does not. Second, whether "sufficiently" throttling the

data "to increase a rate of transfer of the audio information" necessarily entails "comply[ing] with a predetermined quality of service level of audio allowing for no discernable audio decrease in quality." It does not.

The Court addressed these issues, including substantially identical arguments and evidence, in the Target Case. *Target Markman* at 22–24. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### C.      U.S. Patent No. 7,123,699

#### C-1.      "coupling an audio path over the channel between the telecommunications device and the voice mail box"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "coupling an audio path over the channel between the telecommunications device and the voice mail box"<br><br>• '699 Patent Claim 1 | communicatively connecting a path capable of transferring audio information such as voice data over the channel between the telecommunications device and the voice mail box | creating a dedicated electrical connection for the flow of audio information between the telecommunications device and the voice mail box |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction. "Coupling" has its customary meaning, just as in the "… coupled to the hub" limitation. Coupling an audio path over a channel does not require a dedicated electrical connection. Dkt. No. 69 at 17–19.

In addition to the claims themselves, Plaintiff cites the following **extrinsic evidence** to support its position: *Microsoft Computer Dictionary* at 81 (4th ed 1999), "channel" (Dkt. No. 69-7 at 7).

Defendants respond: The "coupling an audio path" limitation requires creating a dedicated connection. Further, the audio path is coupled over a "channel." "As used in the context of communications, the channel serves to carry or transfer information." Thus, the channel of the audio path is "an electrical connection used for the flow of audio information." Further, "the only way the '699 Patent describes the claimed path is by its temporary nature." Dkt. No. 70 at 20–22.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '699 Patent figs.11, 12, col.11 ll.11–16, col.11 ll.31–33, col.11 ll.55–63, col.12 ll.14–16, col.12 ll.39–45. **Extrinsic evidence**: *Microsoft Computer Dictionary* at 81 (4th ed 1999), "channel" (Dkt. No. 70-9 at 5).

Plaintiff replies: Defendants' argument is substantially the same as that addressed by the Court in the Target Case. As recognized in the *Target Markman*, the coupling is not necessarily temporary. Dkt. No. 71 at 7–8.

<u>**Analysis**</u>

There appear to be two issues in dispute. First, whether the "coupling" requires creating a temporary dedicated connection. It does not. Second, whether the coupling is necessarily "electrical." It is not.

The Court addressed substantially identical issues in the Target Case. *Target Markman* at 26–29. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Notably, the Court there addressed whether the description of a temporary voice channel limited the claims to a dedicated connection through the limitation "coupling a second LAN to the first LAN over a WAN." *Id*. at 26–27. There, the Court determined that the description was not limiting as not all communication routes between coupled LANs were described as temporary. *Id*. at 27. While the argument here is more specifically directed to the

limitation of "coupling an audio path over the channel …" and the patent describes tearing down an exemplary "voice channel" after use (*see, e.g.*, '699 Patent col.11 ll.55–63), Defendants have not identified anything in the description that meets the exacting standard required to limit the claim language as Defendants propose. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Accordingly, the Court construes this term as follows:

- "coupling an audio path over the channel between the telecommunications device and the voice mail box" means "communicatively connecting a path capable of transferring audio information such as voice data over the channel between the telecommunications device and the voice mail box."

**C-2.** **"in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "in response to an input at the telecommunications device, sending a user mail box connection message from the second LAN to the first LAN requesting a channel"<br><br>- '699 Patent Claim 1 | plain and ordinary meaning | requesting a dedicated electrical connection between the first LAN and second LAN for the transfer of real-time voice data in response to an input at the telecommunications device |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction. The requested "channel" here is not limited to an "electrical connection" nor is it necessarily "dedicated." Further, the claim recites voice data without limiting it to real-time voice data as Defendants propose. Dkt. No. 69 at 19–20.

Defendants respond: For the reasons set forth for "coupling an audio path over the channel," the channel is a dedicated electrical connection "with some form of temporary nature." And as described in the '699 Patent, the audio information is transferred over the channel in real time. "Indeed, if the voice packets were not retrieved in real time, the entire message would need to be downloaded into memory at the user's device in order to play understandable audio and would run afoul of the 'streaming' aspect of this claim." Dkt. No. 70 at 22–23.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '699 Patent col.10 ll.16–17, col.11 ll.31–35, col.11 ll.55–63, col.11 l.66 – col.12 l.9. **Extrinsic evidence**: *Microsoft Computer Dictionary* at 81 (4th ed 1999), "channel" (Dkt. No. 70-9 at 5).

Plaintiff replies: Defendants argument is the same as that addressed by the Court in the Target Case. Dkt. No. 71 at 8–9.

### <u>Analysis</u>

There are two issues in dispute. First, whether the channel is limited to "a dedicated electrical connection." It is not. Second, whether the channel is necessarily for "transfer of real-time audio data." It is not.

The Court addressed these issues, including substantially identical arguments and evidence, in the Target Case. *Target Markman* at 30–32. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

### D. U.S. Patent No. 8,391,298

#### D-1. "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN"<br><br>• '298 Patent Claim 1 | plain and ordinary meaning | the alpha-numeric depiction of all telephone extensions for all telephones located on the second LAN is stored in memory located on the second LAN |

**The Parties' Positions**

Plaintiff submits: The meaning of this term is plain without construction. Notably, a list of telecommunication extensions is not coextensive with an alpha-numeric depiction of telephone extensions. Nor does a list that contains a plurality of extensions necessarily contain "all" extensions. Nor is storing a list in a server coextensive with storing a list in memory. Dkt. No. 69 at 20–22.

Defendants respond: "The '298 Patent [] discloses that the extension numbers for a particular LAN are stored in the hard disk drive 403 of the server for that LAN; this intrinsic record disclosure is consistent with both the claim language and the only described support for this element." During prosecution of the patent, the applicant reiterated that the "list … stored in a server in the second LAN" must be "found within the second LAN, not outside the second LAN." Finally, "the only written description support for the claimed 'list of the plurality of telecommunications extensions'" is a "list of names and phone numbers." Dkt. No. 70 at 24–25.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '298 Patent col.2 ll.46–62, col.3 ll.62–65, col.11 l.38, col.13 ll.44–46; Dkt. No. 70-8 at 139–153, 151, Dkt. No. 70-8 at 174–91, 185[5], Dkt. No. 70-8 at 220–49, 231.

Plaintiff replies: Defendants argument is the same as that addressed by the Court in the Target Case. Dkt. No. 71 at 9.

**<u>Analysis</u>**

The dispute appears to distill to four issues: First, whether the list is necessarily stored in the second LAN. It is, but it is expressly stored in a server in the second LAN rather than just "memory" in the second LAN. Second, whether the list necessarily includes all telecommunications devices in the second LAN. It does not. Third, whether the list necessarily is an "alpha-numeric depiction." It is not. Fourth, whether "telecommunication extensions" are necessarily "telephone extensions." They are not.

The Court addressed these issues, including substantially identical arguments and evidence, in the Target Case. *Target Markman* at 37–39. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Accordingly, the Court rejects Defendants' proposed construction and determines that this term has its plain and ordinary meaning without the need for further construction.

---

[5] The relevant portion of the January 22, 2008 Amendment appears twice in Defendants' Ex. H, first at page 185 and second at page 189 of Dkt. No. 133-8.

**D-2.** **"select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN"**

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN"<br><br>• '298 Patent Claim 1 | select which of two [lists of the plurality of telecommunications extensions] is to be audibly or visibly displayed to the user | select which of two [lists of the plurality of telecommunications extensions coupled to the second or third LAN] is to be audibly or visibly displayed to the user |

**The Parties' Positions**

Plaintiff submits: Defendants' proposed construction is improperly limiting. Notably, the claim does not require displaying a list, which is separately recited in a dependent claim. Dkt. No. 69 at 22–23.

Defendants respond: "Defendants agree with Plaintiff's new proposed construction to the extent the 'lists of the plurality of telecommunications extensions' are the 'the list of the plurality of telecommunications extensions coupled to the [second or third] LAN.'" Dkt. No. 70 at 25–26.

In addition to the claims themselves, Defendants cite the following **intrinsic evidence** to support their position: '298 Patent col.11 ll.2–47, col.13 ll.44–46.

Plaintiff replies: "Defendants propose a modification of the Court's prior construction that would further limit the 'lists' to specific embodiments in the specification." Dkt. No. 71 at 9.

**Analysis**

The issue in dispute appears to be whether the lists that are selected for display to the user are necessarily lists of telecommunication extensions coupled to the second or third LAN. They are.

While this term was construed by the Court in the Target Case, the parties did not there raise the dispute here before the Court. The Court reiterates its reasoning set forth in the *Target Markman*, but modifies the construction to clarify what is plain from the claim language. Namely, the selection is between "the list of the plurality of telecommunications extensions coupled to the second LAN" and "a list of the plurality of telecommunications extensions coupled to the third LAN" recited in the claims. At the hearing, the parties agreed to the construction set forth below.

Accordingly, the Court construes this term as follows:

- "select between observing the list of the plurality of telecommunications extensions coupled to the second LAN or observing a list of the plurality of telecommunications extensions coupled to the third LAN" means "select which of a list of the plurality of telecommunications extensions coupled to the second LAN and a list of the plurality of telecommunications extensions coupled to the third LAN is to be audibly or visibly displayed to the user."

## D-3. "circuitry for automatically calling …"

| Disputed Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list, wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN"<br><br>• '298 Patent Claim 1 | Plain and ordinary meaning; no construction necessary. | This is a 112 ¶ 6 claim element.<br><br>function:<br>• automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list<br><br>structure:<br>• DSP structure disclosed at 4:26-56, 5:33-38, 6:9-23, 8:66-9:24 and equivalents thereof, including then existing Texas Instrument 5410 DSPs |

**The Parties' Positions**

Plaintiff submits: This term is not governed by 35 U.S.C. § 112, ¶ 6. The claim-recited "circuitry" in combination with the claim-recited description of its operation is sufficiently structural to maintain the presumption against § 112, ¶ 6. Further, if the term is analyzed under § 112, ¶ 6, Defendants' proposed structure improperly includes a number of structural features not necessary to the claim-recited functions. Dkt. No. 69 at 23–28.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '298 Patent col.4 ll.26–56.

Defendants respond: The circuitry of this term is defined by what it does rather than what it is. Neither the adjectival qualification nor the description of the operation of the claimed circuitry

provide any definite structure. Indeed, there is unrebutted expert testimony that this term is not sufficiently definite. As such, this term is subject to § 112, ¶ 6. Dkt. No. 70 at 26–30.

In addition to the claims themselves, Defendants cite the following intrinsic and extrinsic evidence to support their position: **Intrinsic evidence**: '298 Patent col.4 ll.26–56, col.5 ll.33–38, col.6 ll.9–23, col.8 l.66 – col.9 l.24. **Extrinsic evidence**: Souri Decl.[6] ¶¶ 24–26 (Defendants' Ex. G, Dkt. No. 70-7).

Plaintiff replies: Defendants present argument and evidence that is nearly identical to that addressed, and rejected, in the Target Case. Dkt. No. 71 at 10–11.

Plaintiff cites further **extrinsic evidence** to support its position: Souri Decl. at ¶ 1 and p. 9 (Dkt. No. 70-7 at 3, 11).

**<u>Analysis</u>**

There are two issues in dispute. First, whether the "circuitry" term is governed by 35 U.S.C. § 112, ¶ 6. Second, if the term is governed by the statute, whether the Defendants' have identified the appropriate structure. The Court determines that this term is not governed by § 112, ¶ 6 and therefore does not address the second issue.

The Court addressed these issues, including substantially identical arguments and evidence, in the Target Case. *Target Markman* at 43–47. The Court is not persuaded by Defendants' argument and evidence here that the Court's previous construction is incorrect. Thus, the Court reiterates the *Target Markman* ruling and reasoning, rejects Defendants' proposed construction, and adopts the *Target Markman* construction.

Notably, the Court is not convinced by Dr. Souri's testimony submitted on behalf of the defendants in the Target Case and resubmitted by Defendants here. To begin, the Court is not

---

[6] Declaration of Dr. Shukri Souri in Support of Defendants' Opening Claim Construction Brief (Dec. 11, 2020) in the Target Case.

bound by unrebutted expert testimony on an issue of claim construction. *See, e.g.*, *Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1302 (Fed. Cir. 2018) (rejecting unrebutted expert testimony that a term is structural). Indeed, the Federal Circuit has counseled that expert testimony on claim construction, while potentially useful to a court, should be analyzed critically. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc) ("extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias").

Dr. Souri's opinion on the structural nature of "circuitry" is not credible. Notably, Dr. Souri opined that "the noun 'second circuitry' does not convey any structure to a POSITA." Souri Decl. ¶ 24 (Dkt. No. 70-7 at 10). In contrast to this opinion, numerous courts have found that "circuit" and variants connote structure. *See, e.g.*, *Apex Inc. v. Raritan Comput., Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003) ("it is clear that the term 'circuit,' by itself connotes some structure"); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–21 (Fed. Cir. 2004) ("Technical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate that the term 'circuit' connotes structure."); *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1355 (Fed. Cir. 2006) ("In contrast to the term 'mechanism,' dictionary definitions establish that the term 'circuitry,' by itself, connotes structure."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013) ("We have previously held on several occasions that the term 'circuit' connotes structure."). Dr. Souri did not address this line of precedent and instead contradicted it in a conclusory fashion. This cannot simply be swept aside by invoking *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). Notably, *Williamson* addressed whether there is "strong" presumption against applying § 112, ¶ 6 and whether overcoming the presumption required a "a showing that the limitation

essentially is devoid of anything that can be construed as structure." *Id.* at 1349. Neither a "strong presumption" nor a requirement to show that a limitation is essentially devoid of structure was articulated in *Apex Inc.*, *Linear Tech.*, *Mass. Inst. of Tech.*, or *Power Integrations*.

Likewise, Dr. Souri's opinion regarding the structural nature of the entire circuitry term is not credible. Dr. Souri opined that:

> if asked to build a "second circuitry for automatically calling one of the plurality of telecommunications extensions in response to the user selecting one of the plurality of telecommunications extensions from the observed list, wherein the list of the plurality of telecommunications extensions is stored in a server in the second LAN, and is accessed by the first circuitry across the WAN," a POSITA would be able to conceive of a ***number of different ways of doing so***, and no specific structure is required by, or claimed, in the claims of the '298 Patent. Conversely, a POSITA would not be able to determine that an item is "second circuitry" in and of itself; the noun in the phrase is instead ***defined solely by the function it performs***.

Souri Decl. ¶ 24 (emphasis added) (Dkt. No. 70-7 at 10). The mere fact that the circuit is defined by the function it performs does not overcome the presumption against applying § 112, ¶ 6. *See, e.g.*, *Personalized Media Communs., L.L.C. v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("the fact that a 'detector' is defined in terms of its function … [does not] detract[] from the definiteness of structure"); *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) ("[T]he mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions."). Further, the mere fact that there may be a "number of different ways" to implement the claimed circuit does not overcome the presumption against applying § 112, ¶ 6. *See, e.g.*, *Personalized Media*, 161 F.3d at 705 ("the fact that the term 'detector' does not connote a precise physical structure in the minds of those of skill in the art [does not] detract[] from the definiteness of structure"); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1370 (Fed. Cir. 2002) ("a term need not connote a precise physical structure in order to avoid the ambit of [§ 112, ¶ 6]"); *Skky, Inc. v. MindGeek s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) ("it is sufficient if the claim term is used in common parlance or by persons of skill in the

pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function"). Again, Dr. Souri did not address this line of precedent and instead contradicted it in a conclusory fashion.

Finally, Dr. Souri did not analyze whether the claim-recited functional language itself, when read with the term "circuitry," informed the structural nature of the limitation. The Federal Circuit has instructed that claim recitation of the objectives or operation of a circuit denotes structure. *See, e.g., Linear Tech.*, 379 F.3d at 1320 ("when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 P 6 presumptively will not apply"); *Mass. Inst. of Tech.*, 462 F.3d at 1355 ("the term 'circuit,' combined with a description of the function of the circuit, connoted sufficient structure to one of ordinary skill in the art to avoid 112 P6 treatment"); *Power Integrations*, 711 F.3d at 1364 ("A description of the circuit's operation may provide sufficiently definite structure [to maintain the presumption against § 112, ¶ 6]."). Again, Dr. Souri's opinion fails to address an issue that, according to Federal Circuit precedent, is critical to determining whether § 112, ¶ 6 applies. This deficiency cannot simply be swept aside by invoking *Williamson*. Ultimately, Dr. Souri's opinion lacks the hallmarks of reliable expert testimony.

Accordingly, the Court rejects Defendants' proposed constructions and determines that this term has its plain and ordinary meaning without the need for further construction.

## V.     CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the

parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 18th day of June, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE